Good morning, Your Honor. My name is Tom Bertides. In the 30 minutes that I have, I'd like to take initially 15 minutes with a three-minute rebuttal, and then give 12 minutes to Mr. Sasha Sampert-Champion for his amicus brief. Keep track of your time there. I will, Your Honor. Thank you. As I stated, my name is Tom Bertides. I represent DP and the Payne family. And, Your Honor, I think it's important to understand some of the factual distinctions in this case when discussing maybe some of the broader principles that the Court's going to wrestle with in this case. The first fact that I'd like to bring to the Court's attention is that the district's action of locking DP into this safe room without a window is simply unlawful behavior. And Judge Newton cited that in the dissent. There's a Washington Administrative Code provision that says the manner in which they did this with a locking mechanism, covering the window, and leaving DP in there for indefinite periods of time violates Washington law. But could it have been addressed through the administrative process? That, Your Honor, could have. Admittedly, if the Paynes would have known if that was happening, and would have known that this was going on, that could have been addressed in an administrative process.  What standards should we use, then, to determine whether a tort claim arising out of the IAP or alleged misuse of the IAP is subject to the exhaustion procedure of the IDEA? Your Honor, I think one of the important considerations is what is requested by the family. Here, this went on. The Paynes tried to work with the school district that entire school year. Factually, the Paynes did not know that their son was being put locked in this room. What the record will show is that DP was being put into this room. The parents did not know that. In September, the beginning of the school year, it was represented to them that this door was- But it appears that a safe room was conceived as part of the IAP. So, are you saying how the safe room was used is what they didn't know? Because it doesn't show there's evidence in the record of that. Factually, what the record will show is that the Paynes were represented in September, that that room would not be used for DP with a lock and a door in place. It could be used for other students if their parents consented. But for DP, it was represented that that door would be taken off. It wouldn't be used as punishment, and a beanbag would be put in there, and an aid would be put in there, and it would be a cooling-off room, an area where a child with autism has the ability to calm himself. Maybe you can clarify what you meant in answer to Judge Lawrence's first question. When you say it could have been addressed, what exactly do you mean by that? Do you mean they could have used an administrative process to get them to unlock the door? What did you mean by it could have been addressed? Certainly, Your Honor. The Paynes could have filed a due process request and requested an administrative hearing in September when this was going on, if they would have known that was in the process. And to achieve what is the question? Probably to take the door off, exactly what they were asking. What happened and why the facts are very different. They're not asking for the door to be taken off now. Once the Paynes found out that this was going on, they took the door off, but they took the door off in January, and then DP wasn't put in that room anymore. So what are you seeking now? The Paynes have filed a complaint, which was one year after, seeking no retrospective damages but money damages for the psychological damages and injuries that both the mother and the son endured as a result of this unlawful behavior. So, counsel, the IDEA really has nothing to do with this case. This is essentially a Fourth Amendment deprivation, deliberate indifference, 1983 case, is it not? That's absolutely correct, Your Honor. And with respect to the IDEA, the only thing that I find in the entire complaint is 6.1.5, where it says Payne had statutory rights under IDEA, but there's nothing in the prayer that asks for any kind of relief under IDEA. So this is basically, the IDEA really has nothing to do with this case. That's absolutely correct, Your Honor. If that's the case, why in your complaint did you ask for educational opportunities? What does that mean? Your Honor, the IDEA was referenced in the complaint just to give notice of the level of constitutional deprivation, because the important point to consider here is that even before DP had an IEP, if you look at that date, the September 24th date of the IEP, in the record on page 375, you'll find that DP was locked in this room on September 11th, September 17th, and September 23rd. So are you basically asking for, in tort parlance, pain and suffering damages? Correct. Counsel, I have a question. Excuse me, just go ahead. Thank you. One of the issues that I think we will, at least I will be wrestling with, is how to identify on more than a case-by-case basis those instances in which the IDEA provides the exclusive remedy, or at least is required to be followed first, and those in which it doesn't. And it seems to me that you can't rely solely on what damages you seek, because then you could just tack on a request for money damages any time. So is it the nature of harm? And if so, how would we define that? Or how do we write a text for more than this case? Certainly, Your Honor. I think the Court has spoken very clearly by just pleading monetary damages is not enough. I think you have to look at the remedy. You have to look at whether the issue involved deals with the actual prospective IEP. Like a case in Rob, that was an IEP decision. That was a young woman that was being taken out into the hallway to be taught. That deals with how she's being educated, the location of her education. In Whit, a case that this Court has considered, that was very different. That was where punitive actions were being done to a child, arguably in an educational strategy, but they were injurious and punitive, and the Court had no problem distinguishing that. I think to answer your question, Your Honor, is to look at is the issue revolving around the IEP? Does the issue deal with classroom placement or where the child is going to be educated? And in this case, that is not the case, because this case is on all fours with Whit, and it's also on all fours with a case decided by the Sixth Circuit, I believe, in Covington. Covington was a case where a young man was being put into a safe room as well. And what the Court in Covington did was found that the exhaustion requirement was satisfied because that child had gone to a different school. And really what you have here is the parents aren't trying to do an end runner at the IDEA. If you follow the record, they negotiated with the district, and they got the door taken off in January, and D.P. or Dylan went through the rest of the school year there. In April, and what's very important in the record, Your Honor, is you'll find it on page 441 and 442. There was a two-day mediation process in April of 2004 that the Paynes went through. And just like in Whit, a good faith effort was done, and the parties agreed, the district agreed and the Paynes agreed, that extended school year for the summer would be given to Dylan, transportation would be given to him, and he would transfer from Artendale School to Harborview School. And for that entire next school year, the 04 school year, Dylan went to Harbor Heights and did fine. Can I ask you a question? What is the practical problem with asking that you exhaust all the remedies first? If I understand correctly, these remedies are not binding. Is that right? If you were to go to a due process hearing, Your Honor, you would essentially receive whatever remedy you would receive, and then you could actually file, you could take it or leave it. Exactly. Okay, what's the problem then with asking them to try to resolve it that way first? One, it is emotionally exhausting. The Payne family went through a two-day mediation where attorneys for the other side, district officials, they went through a two-day process, which was exhausting. To do that and then go through an administrative hearing where I guess they could do it by themselves, but to do it effectively, you'd need counsel. You'd have to go through this entire process, and then after completing that process, then they would have to go and then file a complaint. It strikes me that the action they're complaining about here happened in, what, 2003, 2004? Correct. Here we are in 2010, and we're worried about whether they should have exhausted it. All they had to do was go to their hearing. Maybe they'd get what they want. Maybe they wouldn't. Maybe it would resolve it. Maybe not. Maybe it would be helpful. Maybe it wouldn't. But then they're off and running. Instead, here we are seven years later worrying about whether they should have asked for a hearing first. It doesn't cost them a nickel, as far as I can tell. Your Honor, respectfully, there wasn't anything that the process could afford them. Let's suppose the process could afford, you suggested, the room. Let's suppose that they knew about the room. They sat on their hands for a couple of years and then got concerned about it. Then all of this transpired, but there were two years in which he was subjected to this behavior. They could have and didn't do anything about it. When we get to the lawsuit, this lawsuit, in such a situation, would that play into the measure of damages in any way?  How would that failure to actually give the school an opportunity to deal with it during the first two years be factored into the analysis? Your Honor, I respect the question. I don't understand what the Payne's could have done, though. I'm talking about, you know, you say that it could have been remedied if they had known about it. Okay, let's suppose they had known about it. And they contributed to the trauma, in effect, that now you're seeking damages for later on. You know, in damages is the concept of mitigation. And I'm trying to understand, the IDEA is clearly focused on giving the school the first crack and getting parents and teachers and school administrators to work these things out so we don't have to come into court. I notice that you, in fact, are asking in 7.4 for declaratory relief, which wants a ruling that other similarly situated students can't be put into a locked room. Is this district court supposed to now decide what the policies are for autistic students beyond the facts of your case? And if so, why isn't the school given the opportunity on a broader scale, then, to address these issues? Specifically with regards to the Payne family, Your Honor, informally that was done. The Paynes didn't simply just say this happened. I'm not suggesting they did. Correct. But everything that the hypothetical due process hearing could have afforded them, they received. They went through processes. One of the things that happened was after they found out their son was being locked in this room, they negotiated with the district, and the district took that door off. And then they realized that this child was sustained from this, that they had to move him to another school, and they did that. And they went through this process for a year, and DP flourished at this school. And the reason why he didn't stay at that school is because that autism team was changing. So he, in good faith, participated, just like in WIT. He participated in a formal IEP mediation process. Both parties agreed to a satisfaction, and the record you'll find on 441 and 442, they signed an agreement, and all parties moved on. The issue was resolved with regards to what the school district could have done. There's nothing an administrative law judge could have done differently that the Paynes and the district figured out in that mediation, two-day mediation process. Let's say that hadn't happened, which I thought was what Judge Fisher was asking me. Maybe I misunderstood the question. But let's say this were a different case, and let's say it's not the Paynes. Let's say it's another of the Joneses. We're in the same situation, and they did not pursue administrative remedies. They did not seek to obtain educational benefits. Two years later, they sued. And I thought the question I heard was what effect does that have, the failure to exhaust and seek remedies under the IDEA? What effect does that have on the relief of the damages or the availability of relief under 1983? Would that affect, would that be a failure to mitigate and thereby reduce damages, or would there be any effect at all? Or could they just let things get worse and worse and worse, not seek educational relief, and then go in and try to get a jackpot in money? Your Honor, it's an interesting hypothetical. What you would be doing then is treating people that fall under the IDEA different than kids that wouldn't fall under the IDEA in the sense that you'd have it. Well, they do have a chance to mitigate the IDEA if they know about it. And again, we're talking about a different fact pattern than here. They know about it. They let it go. They don't go in for administrative relief. Arguably, they've consented, or arguably they sort of allowed it to get worse than it needed to be, right? Right. And in your hypothetical, then, the family would have waived any type of recovery under the IDEA, which would be compensatory services and counseling. But your claim simply would be for monetary damages. Yes, but then it would be a failure to mitigate them. Is that what you're saying? That would probably be an argument that would be raised by- That would be a trial argument, right? That would probably be. Let's say you're at trial. You have pain and suffering. Let's say in your case, to the extent that there's psychological counseling needed as a result of that, then would the trial judge need to determine whether that was something that would have appropriately been under the IDEA and that you might not be able to recover that kind of damage? That would be an issue that the trial court would have to address. Why wouldn't, instead, you look at the source of the harm? If the source of the harm, regardless of whether it's emotional or physical or causes money damages or doesn't, if the source of the harm relates directly to the educational placement, either an action or inaction involved with the educational placement, it seems that the IDEA would be the exclusive remedy and you'd have to exhaust. But if the harm arises from something else, such as physical abuse or something not specifically educational in nature, would that be a workable rule? Your Honor, what you would have is, I think, the connection the court has with the opinion in this case, is that it's an educational attempt. The facts and wit, the defense would argue, this was an educational attempt. We were trying to help this 10-year-old child who had Tourette's get through this tick. That's why we would force him to walk a certain way or give some kind of remedial stimuli when he did something. Everything would be argued as an educational attempt. But the difference is, that was not part of the IEP. In this case, the high knock room was part of the IEP, wasn't it? No, it was not, Your Honor. It was not part of the IEP until it was given in an aversion therapy plan in January. The pains didn't receive, this IEP that's stated in September wasn't given to the pains until January. That's in the record. So what happened is, in September, there was a very informal meeting. The pains were, it was represented to them that their son wouldn't be put in this room. They find out in October this is going on, and the mom goes in and confronts the teacher. It starts getting really aggressive and sour, just like in wit, threats were being made to the family. This district went out and went after one of their therapists and got him fired. And then what happens is, this comes to a head, that in January, this family finally gets the door taken off this room, goes into mediation, and then has the child moved to a different school. The child flourishes, realizes that homeschooling is the best, and then they come back to file the complaint. This case is on all fours with wit, and the same facts that you're wrestling around in this case are also found in the Covington case. And I'm running out of time, Your Honor, but what I would just quickly state is that if the court decides that the IDEA needs to be established in this case, I would respectfully request the court consider that the pains satisfied the requirement for exhaustion. The pains went to this two-day mediation, and just like in wit, they reached an accord. There wasn't a disagreement as there was in Katase, a case that this court considered earlier. I understand where you're coming from, but I do have to ask one other question before you step down. And with the Supreme Court's opinion in Jones v. Bach, a failure to exhaust remedies under the – if it was an affirmative defense rather than – And because it seems that the Supreme Court was looking at a similar situation, and they said it's not jurisdictional, but it is an affirmative defense. It doesn't keep you out of court, but it's going to be factored in. And I think it raises to all these issues that we're discussing about what form of remedy the family could ask for at the trial court level, and probably they'd be limited to just their pain and suffering and emotional damages from being subjected to the harm. Thank you. We'll hear from the United States. May it please the Court, my name is Sasha Sandberg-Champion, and I am here on behalf of the United States. I would like to begin by jumping right to the question that several members of the Court have posed. So you don't use up your time all on that. Would you address at some point in your argument this notion in our cases that if the damage remedy includes – you talk about it at pages 11 and 12 of your brief – if it includes in essence an in-kind – if you would address that. Okay, well, I'll address that right now. In our view, if the measure of the damages the plaintiff is seeking is in the form of that sort of relief, in this case, if the plaintiff had been asking for damages for the cost of educating their child in private school, for example, that's relief that they could have gotten through the IDEA, and then they would have had to go through the IDEA to do it. But we don't believe that because such a remedy is available through the IDEA, therefore every damages remedy in effect gets converted into such equitable relief. So you're looking at the IDEA as kind of a preemption concept? In other words, to the extent that a claim which is essentially a constitutional tort under 1983 somehow could have been remedied through the IDEA, then the IDEA takes precedence, even if it would never even refer to in the complaint? No, in fact, that's exactly what we're saying is not the case. The IDEA does not preempt a claim that arises under another law and does not seek a remedy. It only preempts, I guess it never preempts at all, but it sometimes requires the exhaustion of administrative remedies only if you're seeking relief that is available under the IDEA, such as in Pennsylvania. Is there a view that the plaintiff controls whether the IDEA exhaustion requirement is triggered simply by pleading the claim in such a way as to avoid asking for relief under the IDEA? In some cases, if certain other conditions are satisfied. In a case such as this one, the plaintiff certainly controls it by, for example, not seeking compensatory education, not seeking any of the services that the IDEA has to offer. In other words, by waiving his IDEA rights, by choosing not to stand on his IDEA rights to the extent that he could have in this case. Can I be specific on why I was asking my question? 7.1 of the complaint seeks general damages and special damages. In Rod, there was a suggestion, and I think they were quoting from Charlie F., another case, where there was the opportunity that the nature of the damages had to do with psychological harm, and that what the district could provide if they had violated his rights, what they could provide while he was still under their auspices, they could provide those psychological harms, and those were the kinds of things that ought to be exhausted before coming to court. Your argument in your brief, in any event, is that no, the IDEA would not cover those. That's where I'm confused, because if one is looking at how it's planned, it's not clear to me that some of those special damages or general damages wouldn't include services that the school district could provide in kind to remedy the harms that their teachers have caused. Well, I think the answer to that is the plaintiffs in this case would be precluded from seeking that as part of their damages remedy. They would not be able to, for example, ask the court to provide them with damages in the measure of the cost of psychological services that would equip a child to function in a special education environment, which is all that the IDEA provides. Well, doesn't that then make sense? Like I had asked the question about, if you look at the Supreme Court's opinion in Jones v. Bach, where they're interpreting a statute, and if a failure to exhaust administrative remedies under the IDEA is no longer jurisdictional and it's an affirmative defense, would that solve the problem? It certainly would make it more of a factual question to go on and strip that out, strip out part of the claim. Because right now, the way it is here, the failure to exhaust is not true out of court. It's jurisdictional. Instead, it would strip out that measure of the damages, that much of the claim. And it would give the plaintiffs less control to put magic words in terms of to try to take those things out of the IDEA that really belong in exhaustion. That's exactly right. I mean, we stand on the substance here and not on the form. We don't think the plaintiffs can use clever pleading to get relief that they should properly find under the IDEA, nor do we think they should be moved out of court just because the IDEA rights also could have been asserted. But do you think that Jones requires us to look at the IDEA in the same way that they look at the PLS, well, whatever the initials are, the prisoners litigation? I am not prepared to give an opinion on that on behalf of the United States Constitution. It sounds to me as if you would like our focus to be on the relief sought and whether the relief is available, which is the statutory term under the IDEA. And some of our cases have looked at it that way, and some have looked instead at the source of the harm that's alleged, whether it stems from an educational event or placement or program. Would you explain specifically what you think the test should be, henceforth, that we should apply to all of these cases? Absolutely. And may I say initially that although this Court's opinions and other Courts' opinions have focused on the injury, oftentimes that ends up collapsing back into the relief. So we think the Court has actually reached the right result in the vast run of cases. Having said that, we think the statute clearly requires the focus to be on the relief sought. And we think there are three conditions, thus, that must be satisfied for a claim such as this to be brought to court. The first is that they must not bring a claim under the IDEA itself or one that effectively arises under it, such as a claim under Section 1983 that is premised on a violation of the IDEA. The second is that you must not claim a deprivation of a free, appropriate public education or other right that is an IDEA right. You cannot bring that, again, a species of IDEA claim in disguise. And again, that's not what the plaintiffs are doing here. They're not claiming relief based on a failure to educate. And the third is you can't seek to modify an ongoing educational practice. That's probably the subject of an IEP. And the implication in this case, for example, we do think that in this case, in September or October of the year in question, we do not believe that Payne's could have come to court and brought this claim, even if they were only seeking damages. Because for a court to do that, they would have had to find an ongoing educational IEP-related practice was improper and effectively something. Counsel, the plaintiffs have brought a 14th Amendment claim. And as best I can tell, it divides into both a procedural due process claim and a substantive due process claim. Would either of those claims be barred under your theory? Would either of those claims be barred under the government's theory of what exhaustion is required? At the time that they brought or if they had brought the claim in October before? I don't know. They have brought a procedural due process claim. Now, I'm not exactly sure what they're complaining about. But that seems like the kind of thing that could be remedied by a hearing. In which case, it sounds like it sounds in the IDAA. That's right. We do think that if they were to bring a claim at a time when this practice was going on, they would have been barred from bringing that claim in particular. As you say, that sounds like they're complaining about the process available to them. Mr. Sabra, just to follow up on Judge Bybee's question, you've given us a three-prong test that you're recommending. In this particular case, as I understand it, the pains did have at least an informal hearing. And out of that, at the very least, there was a transfer that was negotiated and so on. At a later point, of course, they filed a complaint. And you, of course, have seen that, you know, what the prayers of the complaint are. Since they had a hearing to cover some issues and got some relief, then filed a complaint, is there any portion of the prayer that you believe would fall under any of the categories that you talked about? And if that were the case, does that represent a failure to exhaust? No, I think the complaint is seeking to address entirely injuries that happened in the past instead of this boy's treatment looking forward. For example, the mediation. What about the due process issue that was raised by Judge Bybee? I think they're always seeking to be compensated in the form of damages for that. Now, as you say, to the extent that I guess I, like you, are not entirely clear what ultimately that means, what the plaintiffs are claiming is the wrong thing. If their claim is, for example, that the mediation was improper, that the process there was improper, in that case, they were aggrieved by that and they could have sought a due process hearing. Since it's obvious that we're dealing with how many angels can dance on the head of a pin here, isn't what Judge Callahan suggested following on the Supreme Court perhaps the proper way to look at this? This ought to be an affirmative defense rather than kind of a gotcha where seven years later you're sent back to an administrative hearing when there's really little that could be done. What would the government's position be about that? Well, I think that's absolutely the case. In fact, in this case, I think there's no such thing as sending them back to an administrative hearing because their time for seeking such a hearing has long since run. There's a two-year statute. What would you say about claims that, and this may be the same as Judge Bybee's question, but let's suppose that there had been a due process hearing and the complaint was that they were berated during it and it was a terrible procedure and they suffered pain and suffering and humiliation from the awful questions that were asked during that hearing. They aren't actually, those aren't remediable by the hearing, but are they available relief or available damages in court either? Well, I guess to the extent that we're talking about exhaustion, it ultimately doesn't matter because they would have exhausted any remedy under the IDEA. I don't know whether there's a compensable claim for your treatment in a due process hearing and whether that arises, in fact, under the IDEA itself or under another law, which I take it is the question you're asking. Counsel, are our cases in rob and wit intention, or do you think they're easily distinguishable? I think the wording of them is intention, but I think ultimately both were correctly decided. In rob in particular, the plaintiff in that case was bringing a Section 1983 claim premised on a violation of the IDEA, and we believe, and this Court has since said that such a claim does not even exist, but to the extent that such a claim exists, we think that effectively does arise under the IDEA itself, and let's go through that process. Could I ask you under your three-part test how you would decide whether or not 7.4 of the complaint, the declaratory relief claim, would be viable, where it says they want a ruling declaring that the policy, procedure, or practice of placing Dillon and other similarly situated students in a locked safe room and so on and so forth. Is that properly now in the district court so the district court could issue a blanket ruling covering all autistic kids under any circumstances? Well, I think for other reasons the district court might not be able to issue such a ruling. I don't think there's evidence in the record, for example, that goes to it, but in terms of exhaustion. Let me be specific. It says your third one is cannot modify an ongoing educational process. That's right. So that aspect of the complaint would not qualify? When I say that, I'm not speaking with respect to a systemic claim, a claim that a certain practice is by its nature unlawful anywhere. I'm talking about a claim in which you could actually go to an IEP meeting, in which you could go to mediation, in which you could go to the due process hearing, and the facts of the individual case do matter. What Your Honor is talking about is a quite different matter. I do agree with you that that's a harder case. To the extent that he's trying to be a class action representative and use the fact that this specific case is a class action representative, which I think ultimately has been dropped in this case, he might have to do that. Okay. Thank you. Thank you. We'll hear from the school district. Good morning. Mike Patterson on behalf of the Peninsula School District, Ms. Coy, and the superintendent. The preliminary statement I'd like to make is how critically important the court be informed by a factual record developed by those well-versed in the technical issues around educating children and disabilities. And I raise that because there was a question about whether or not the better way to handle this is through an affirmative defense. I do not believe that that's the best way, and I don't think that Congress ever intended that. And certainly we would have the court system then involved in the classroom in developing educational remedies. Well, even if it's not a better way, do you think that it may be compelled by Jones v. Box? I do not. And the reason I say I do not, and I think the best test is this. I think WIT was rightly decided. I think that Rod is the test. WIT is the exception to Rod. And I think WIT sets out the parameters that this court ought to develop, and that is, number one, was there any educational purpose for what was being done here? And I certainly would answer that and the negative insofar as WIT is concerned. With the very things that were happening there, clearly it was not educational. But the court went on in WIT to say that they had already exhausted their administrative remedies. They had already exhausted everything. WIT came first. Pardon me? WIT came first. The exception came before the rule? No. But I think this is similar to Rodriguez, which was recently decided in the district court. He said Rod is the rule, WIT is the exception. I was just pointing out that chronologically WIT came first. Usually you have a rule and then you have an exception. Correct. But I think Kutasi had already set forth that rule. And Kutasi and Rod, I think, are really where you should be going here. Kutasi was 2007? Right. WIT was 1999. Correct. But I think that there's a number of cases that preceded that, that obviously accept the test, that the plaintiff cannot create the cause of action. How do you draw the line between what you call the rule and the exception? I mean, let's say the claim were that the teacher, in order to encourage compliance or encourage what the teacher is talking about as a learning process, would beat the child, use the paddle, which in this country happened in school not so long ago. I understand. It might even have happened during my time in school. During my time. But, you know, these days it's not considered appropriate. And let's say that were the claim. And the teacher said, well, I did it because I thought this would encourage learning. Is it part of the IEP or it's not part of the IEP? If it's not part of the IEP, then I would say there's probably, in this day and age, little educational benefit from that. And WIT also pointed out- I'm sorry. I was thinking through the-I didn't have an answer to your question because I hadn't thought about it. So, let's take it both ways. Because I don't-I'm just trying to think through the process. Let's say-I would guess it would not be in the IEP because you don't put paddling in the IEP. But let's say the teacher said, well, you know, what the IEP said was the teacher will work with the student to gain compliance with their educational goals. And I, as a teacher, thought that a good way of doing it is by paddling the kid every so often when he didn't comply. And in my experience, it works. Would that be a sort of attempt at education and, therefore, under the fall under the rule of Rob? Or would it be like WIT? I'm just trying to understand where you think that kind of claim will fall. Well, that claim there gets into the physical injuries. And I think WIT talks about physical injuries. Well, it's not physical injuries. Let's say that there's paddling and those of us who occasionally got paddled didn't have any permanent physical injuries, but there's psychological harm or, you know, whatever. And the parents are bringing a claim that's saying that the child has been traumatized by being paddled in front of, you know, fellow students. So, let's say there's no physical injury. Would that be a WIT claim or would that be a Rob claim? I think it would be a Rob claim because in that particular situation, I think it could be addressed administratively because you obviously now have a teacher that's operating outside the IEP that should have been brought to the attention of the parent. And in this particular case, by the way- I'm sorry. If you think that would be a Rob claim and, therefore, has to be addressed administratively, give me a WIT claim other than WIT itself. Rodriguez, which was just recently decided by a district court in Arizona. I'm sorry. It was a bus driver that was hanging a boy upside down, holding his legs and shaking him and choking him. That would be an example of WIT. Why wouldn't that be sort of disciplined, trying to ensure safety and discipline? I realize the bus driver, of course, is not an educator. So we'd have to change the facts of Rodriguez a little bit and say, let's say it's one of the educators. I think if you're dealing with somebody who's not an educator, you're really outside of the- if you're dealing with a school guard or if you're dealing with a bus driver, as in the case you cited, you're in a different situation. But let's say you're dealing with people who are involved in the educational process. Let's say the teacher is used to pulling hair or pulling ears or yanking the arm or paddling or engaging in some physical abuse. In your view, that's all Rob. None of that is WIT. Well, I think if it gets to an egregious nature, I think it gets into WIT. And the question is, was there physical- Well, why? I mean, and the question I have is, how do you know whether it's with a Rob until two judges on the Court of Appeals tell you whether it's with a Rob? Well, I think if you apply Rob or Kutopsy and there's a question or it's unclear or there's an ambiguity, then you go the administrative route. So essentially what you'd have to do is go the administrative route regardless because you never know if you're dealing with an educator. Again, if you're dealing with a bus driver or a guard or a janitor or somebody like that, you could say, well, you know, that's not educational. But so long as you're dealing with a principal or a teacher or a teacher's aide, you always have to go administrative because you can never tell what two judges on the Court of Appeals are going to- Well, I don't say always. But you can't give me an example standing right there of a situation involving a teacher. Let's say somebody, a teacher in the classroom. Can you give me an example where if you were the plaintiff's lawyer, you would say, I feel confident that I can just go into district court. I don't have to exhaust because, you know, this is a clear case. Can you give me such a case? I can give you an example. Please. An example would be if you're dealing with autistic children such as this where DP was biting, kicking, spitting, butt-heading, those sorts of things, reported that I've got bruises, those sorts of things. The teacher gets extremely fed up with this whole behavior, wrestles DP to the ground, chokes him, hits him. That would be a situation that would be akin to wit, and I do not believe in that particular situation. Why not? That would be a situation where one might say, well, that was, as the majority here in this panel, majority said, this was at least an excellent education. But it wasn't part of the IEP. In this particular case, the safe room was part of the aversion intervention plan. It was also part of the behavior intervention plan. Counsel, in this case, by the time the complaint was actually filed, there were no remaining educational issues to be worked out. I disagree with you. I think the record at 441, 442 indicates that the mediation process only resolved eight out of the 13. And certainly Mrs. Payne herself indicated that we did not exhaust all these remedies. And I might point out that paragraph 5.11 of the complaint specifically asks for remedies that include significant regression in communicative and sensory functions. In addition, as academic prowess and abilities were diminished, all of these issues could be dealt with occupational therapy, physical therapy, psychological counseling, not only to DP but to the parents. With respect to the safe room, that issue was resolved at least, yes? Yes, they made a decision and they said we do not want our son in the safe room. And I might say that she knew that he was in the safe room because there were journals, daily journals sent home, so she knew what was happening and she knew he was in the safe room. Mr. Patterson, without going into the details of this case, why isn't exhaustion treated here like it is in most instances where the defense comes forward and says it wasn't exhausted under the statute, whether it's the PLRA or various other administrative things. And the court says, well, that appears to be right. And the other side can say, well, either one, it was exhausted or exhaustion would be futile. And that's normally how exhaustion proceeds and then you make a factual determination and the judge might say, Look, three of these claims, like the ones you mentioned, educational rehabilitation, some kind of psychological counseling, those are clearly IDEA claims and you can't bring those in federal court without exhaustion. These two claims, the example you gave that that had occurred, clearly is one you could bring in federal court. So you kind of have a choice. You can either drop these claims because you haven't exhausted them and go forward with these. Why isn't that the way it would normally work? And what would be the problem with that kind of a system? Well, the problem with that is that you do not have a developed record that would be developed through that due process by experts in the field of education. Because at that particular point in time, you have the courts really in the educational process and especially in the special education field. Well, wait a second. What do you need an expert for? All you need to do is come in and say, Look, this is part of the faith. It's part of the IEP. And it shouldn't be in federal court. It should be in administrative and kick them out, judge, on all those claims. Why isn't that just something that judges do all the time? Is it exhausted? Is it not exhausted? Well, because the focus should be on the student and getting the assistance at that level immediately. I suggest that in this particular case, DP, if he pursued those five other areas that were not dealt with in the mediation, could have had those remediated rather quickly. We're now seven years down the road and nothing's happened with regard to that particular issue. And that's the reason why I think you want to develop- He's in homeschool? He is. How long does the due process hearing take? You still haven't answered my question as to why isn't that something the district judge can just do up front and say exhausted, not exhausted, and off we go. Because there isn't a developed record as to whether or not there was educational remedy that could have resolved those issues. How long do these hearings take? How long is a due process hearing? In this particular case, I would say it could have taken place within 90, 120 days. And how long does the hearing itself go? Depending on what's involved, the hearing process could be very quickly one or two days. Counsel, I'm still sorting out in my mind whether the IDEA is a sword or a shield. Typically, it gives rights to parents of children to have particular remedies to continue their education. Here, the request, the prayer is for money damages for a constitutional tort. And the IDEA seems to have been brought in as an affirmative defense, although obviously that's not quite how the district court saw it. How do we deal with this? It just seems to me that in answer to my question earlier, counsel said the IDEA is not an exclusive remedy, that the request in this case has nothing to do with changing the IEP. This is a money damages excessive force kind of constitutional tort. Help me sort that out. Okay. And I think that certainly Robin Kutasi did a good job of sorting that out and indicating that if in fact under IDEA any of those issues can be redressed to any degree or there's an ambiguity or an uncertainty, then in those particular situations, you need to go back and address the administrative remedies. There, the IDEA is being invoked by the school district, in effect. Correct. Because the claim wasn't made under IDEA. Well, and I think the courts have addressed that, too, that obviously lawyers cannot create themselves an avenue to get out of IDEA, and there's plenty of cases that say you cannot do that. No, when you do that, though, isn't the school district basically saying, my affirmative defense right up front for this case is there's no exhaustion, so judge up or out. Isn't that what you're really saying should happen in federal court when they come in, or state court if they go to state court? I think that's exactly what happened here. I think Judge Layton made the right decision. He said, you know, you have an exhaustive administrative remedy, so you need to go back to the educational process. If it doesn't work, come back to court. Well, there's a semantic difference, and you see it as jurisdictional, and potentially under Jones it's actually an affirmative defense, but it would end you up in the same place, right? Go back to court. And go back to the district. And I think this court in Robb was consistent with five other circuits. I think the only case that's sort of an anomaly out there is the third circuit in Matua, and that was overruled in large part by A.W. saying that you cannot say that I.D.A. creates a Section 1983 cause of action in and of itself. Mr. Patterson, I think you probably heard the government's response to my question, how do we examine a complaint to determine whether it is I.D.A. infected, if you will? He gave a three-pronged answer. I'd be interested in your perspective on the government's suggestion. Is that something that would be wise for us to adopt as part of this case, to give guidance to the bar on basically how you steer clear? There are certain things you go to the I.D.E.A. There are certain things that are constitutional torts, and you want to avoid these problems. I know we talked before, you can't just do a pleading issue, but if it's a genuine issue, this is the way you can handle it. What's your take on that? My take on that, and I think the courts have addressed that issue, is that whether or not you're asking for that relief in your complaint, and they're certainly asking for education relief in this complaint under 511, the courts have said, you know, we really need to drill down and see whether or not there's an educational issue here for which we can redress. And I would say that the three-pronged rule ought to be taken right out of wit, and that is, was there any educational purpose whatsoever to the actions being taken? Number one. Number two was, did they exhaust their administrative remedies on an educational level at the school district? And number three is, were there physical injuries involved here that we need to really address? But to some degree, though, doesn't that leave that in the eye of the teacher? Going back to the chief's comment about the teacher who raps people on the knuckles or pats them on the head or something, if that teacher believes that's a pedagogically important thing to do, does that exculpate the school district? No, because the IEP ought to be developed in conjunction with the teacher, the parents, and experts. And that was what was done in this particular case. Washington Administrative Code said that the safe room was okay. It was in the aversion intervention plan and the behavior intervention plan. So that's why you get back to the experts again. You feel that unless there's an administrative record where you have experts weighing in on these sorts of things that the court should not proceed. It should be within the umbrella of the IDEA. Well, I just think that the record in this particular case, the record would be so much clearer here, and we would have much more guidance insofar as a factual record was concerned if we'd gone through the administrative route. You would have learned, for example, that he was in that safe room for 45 times. You know, this urination and defecation issue happened very early on in the process. There were three months when that didn't happen up until January 26th when they said, we no longer want him in that safe room. And the question would be whether or not that was happening as a result of him being terrified about that situation or it was really an example of him being defiant and carrying out his behavior. Whether he was terrified or not, their claim is that this is illegal. And so I'm not quite sure where this gets you. The claim is that they did something that was unlawful. And, you know, like paddling. There's some people, I think, who still think paddling schoolchildren is a good way to teach them. And yet it's unlawful now. So why would that be something that you would push through an educational process when it's not something that could possibly be approved? You couldn't have an IDA that says, yes, you can lock him in a room and turn off the lights and leave him there for 45 minutes even if everybody in the process thought that was a great way to teach him discipline, right? Correct. So what's the point of going through an administrative process where at the end the only answer you could possibly get is you can't do this because washing room law prohibits it? But the record here is very clear that the washing administrative codes allow the safe room and the record... Not a locked one, right? Am I wrong about that? Well, I'm going to submit to you that I know that's an allegation, but the record is clear on that that it was not locked. And I can point to the record on that. And insofar as Ms. Coy's testimony is concerned, it had a spring load. And the only way it could be locked is if a teaching assistant and there were four or five other teaching assistants... I'm sorry. I mean, we can talk about this, but this is something that they allege, and we have to take the complaint as they allege it. We can't sort of litigate right here the question of whether they're... So we have to take the complaint on its face, don't we? So the allegation is that this was done in an unlawful manner. It was locked, the light was blocked, there was no observation of the child. But the record... And I agree with you. You have to take all the facts and the best light according to the pain. But the record does not support that. The record does not support it was locked. It does not support it without light. Then they lose, right? Then they lose on the merits. But just indulge me. Let's assume that the record doesn't show what you claim it shows. So just to eliminate that issue. What's the point of going through an administrative process if, according to what they allege, the thing that happened isn't something that could possibly be approved because it is against the law? If, in fact, that safe room was not being used in accordance with the IEP, was not being used in accordance with Washington Administrative Code, that is a prime situation where the hearing process could resolve that issue. There are complaints that can be made to the Office of Superintendent of Public Instruction. There can be issues raised with regard to the fact that, yes, this was an approved process, but the method for which it was being used by the teacher was inappropriate. And that is the precise issue that the school districts and the experts can decide as to, insofar as the educational issue is concerned. Because in this particular case, I think the record is clear. And it supports the fact that we can find anyone... No, the thing that they didn't know about while it was going on, when they found out about it, there's nothing that the administrative process can do about past behavior, right? Well, and once again, I'm going to submit to the record that there were journals that were handed to Mrs. Payne on a daily basis going back to September, knowing full well what was happening to DP. And so, to say that... and the record is clear on that. Certainly, on January 26, 2004, they decided that they would not use... Did the journal say locked door? Because it wasn't locked. Well, did it? No, it did not. Did it say it was covered, that the windows were covered by colored paper? And once again... I'm just asking if that was... I know that's an allegation you don't necessarily agree with. Well, and I not only don't agree with the record, it does not support that because we do have a record here with regard to testimony. But answer the question anyway. Is that... is it something... you know, the WAC says it has... that the adult needs to be able to remain in visual or auditory contact with the student. They're claiming, well, that didn't happen, therefore it's illegal. I know you don't agree with them, but once they make that,  as to the coverage of the window, the visual range, the auditory range, that sort of thing. But there was no communication because that never happened. And once again, I understand that your acceptance of the facts, but they have to be supported by the record. The record does not support that. But that's how people lose in court if they can't come up with facts to support their complaint. But that's the issue, though, that needs to be resolved at the administrative hearing. The allegation was that they were covered paper. The facts were, and the record supports this, that the paper covered only that portion where he could look out and actually get his fellow classmates going. I'd like to move us for a moment, if my colleagues will indulge us, off the facts and back to the statute that spawned all of this. And reading the statutory section appears to support, or could be read to support, the construct that the government is urging us to meet this year. Because it starts by saying nothing in the chapter, I'm paraphrasing, will be construed to restrict or eliminate the rights that are otherwise available under the constitutional laws, and so on and so forth, except that before filing a civil action under any of those laws, seeking relief that's also available under this subchapter, certain procedures have to be followed to the same extent as would be required had the action been brought under this subchapter. And so it seems to contemplate that before exhaustion is required, the claim should be one that could have been brought under the IDEA to begin with. Otherwise, it just doesn't even make sense. And so in fashioning a rule for the future, shouldn't we be looking at relief that's available under the IDEA, and really not worrying about whether the claim is valid, but just what the claim seeks? Correct. I think you're focused right in on that. I think the Booth case, you know, which talked about the prisoner issue, certainly addressed that issue insofar as the prisoners are concerned, is that, you know, we need to deal with these issues. It, in fact, can be remedied within the prison system. I think the courts, in following Booth, and I know the argument is that, well, are they seeking relief, or is it available relief? And if it's available relief, and if there's a question or an ambiguity, then I think it needs to go through the educational administrative process to determine what remedies under the education, occupational therapy, speech therapy, language, all those sorts of things, psychological counseling. And once again, I just point out that it's been made clear in Blanchard and other cases that that is not only for DP, but it's also for the parents involved here as well. But following up on Judge Graber's question, the request for relief in this case is money damages, which you cannot get under the IDEA. Well, there's the request and the complaint here, and specifically I'm taking a look at paragraph 5.11, is for money damages, you're correct. It's also for declaratory relief. It's also for equitable relief. It's also for declaratory relief isn't under the IDEA. None of these things that I look at in terms of the specific request that he makes in the prayer part, part 7, punitive damages, costs of attorney's fees, even the declaratory relief, none of that is available under the IDEA, so don't we have to reverse? No, because under section 5.11 it asks for significant regression in communicative sensory functions. In addition, his academic prowess and abilities were diminished, and I might point out that... Well, those are recitals of facts. There's no prayer there. Well, I might point out that... Not even an allegation of a cause of action. I might point out that Judge Layton, in his order, referred to that section. It's a problem about Judge Layton's opinion. I think, in effect, he kind of re-characterized the complaint in this case, and that's what troubles me. Well, I don't think he re-characterized it. I think he was pointing to 5.11. I think the panel pointed to a 5.11 and the relief being sought here. In addition to that, there's many cases that indicate that the issue is whether or not there's available relief under the IDEA, and my point is, if you go to the mediation process that took place, you go to the record of 4.41, 4.42, and they only resolved 8 out of those 13, and the occupational therapy and the physical therapy and the psychological counseling, all could have been done, and you combine that with Mrs. Payne saying, I haven't exhausted all my misery there. Well, then, could there be bifurcation here? In other words, assuming, just for the sake of argument, that I would agree with you that 5.11 is a prayer, that perhaps that issue would go for exhaustion, but the money damages with respect to, let's say, false imprisonment or whatever the guts of that claim is, would go forward. Well, I think there's been at least some efforts to try to do that. Blanchard was probably a case that was decided where the mother brought the claim. She had been actively involved in that administrative process. I think even in Blanchard they said that she'd pretty well exhausted every effort that she'd made, but they let that case particularly go forward. But there's other cases that say, wait a minute, you've got to wait. I don't care whether you've got a Section 1983 claim, an outrage claim, a negligence claim. If, in fact, there's an exhaustion issue here, go back, get that resolved, and bring the whole thing before the courts. What if they said we wait that? All those things that you said were appropriately part of the educational opportunities that could be provided by the district court. What if they say we waive all of those? And could they go forward on just their damage claim, waiving the kind of relief that one might get under the IDEA? Well, I think those were addressed in the court decisions as well. Well, I'm just asking you, yes, could they do that? Why wouldn't that be appropriate here? Well, you kind of got to pick your poison, you know, go forward on the 1983, but you can't have all these kind of damages, which you appropriately argue really are IDEA damages, and you kind of have to make a choice. Why wouldn't that be appropriate? Well, it may be appropriate at a particular level, but I think it's been addressed at the appellate level where there's been an attempt to waive and say, no, we're no longer seeking any educational issues or anything else. But the courts have been consistent on that and said, well, wait a minute, we're not going to recast the case that was heard by the underlying court. No, I mean, it would be something we've done in the trial level, not the appellate level. I agree with you. But isn't the problem that that's sort of been self-inflicted damages, because if you don't give the school district the opportunity to remedy whatever the psychological harm is, whatever the assessed damages are, is that the plaintiff is driving the damages without giving the school district the opportunity to mediate against them. So I agree with you wholeheartedly on that issue, and I think the courts have been consistent with regard to that, is that we're not going to allow the lawyers to create the remedy. We're not going to allow the lawyers to create the futility. What we're going to look at is whether or not, is there some ambiguity here? Is there some reason that there's a belief that can be garnered under the IDA? And can the education relief be taken care of here? And I think you've hit the nail on the head here. We've got to remember that we are dealing with disabilities here. We are dealing with a child that has autism. It is a serious disability. You've got four or five other aides in that classroom, including the teacher. You've got somebody that is acting out behaviorally. What is in the best interest of that child? What's in the best interest of that child is not to wait seven years for a redress to whatever they believe is wrong in that educational piece here, but to get the record straight with regard to the experts, the record straight with regard to what the educational remedies are, get the record straight with regard to what remedies could have been afforded at that particular point in time, and if they still feel agreed, bring it up to court. You keep reverting to the notion, the statement that only eight of the issues were resolved in the process, that counsel is arguing substantially compliance with exhaustion. What more would have happened in a due process hearing that's relevant to the claims that are articulated in this complaint? Well, they would have addressed the occupational therapy. They would have addressed the physical therapy. They would have addressed the speech and language. They would have addressed the psychological counseling issues, not only to DP but to the parents. So what you're saying then is, looking to paragraph 511, the element of damages, as you read the complaint, would include damages for compensation for all of the things that are in 511.  And those could have been addressed through a due process hearing by eliminating or providing what we were talking about earlier, as in-kind remediation? Exactly. And one piece that's under special ed is compensation. What if they're not seeking that? Pardon me? What if they're not seeking those things? I mean, they don't have to get ‑‑ why can't they just say, look, we don't want those things? Well, I think, once again, the courts have addressed that. They said that you can't ‑‑ I mean, I agree with you with part of your problem, which is just that you couldn't get money for those harms instead of going in and getting them. But why can't they just say, look, that's not the kind of thing we want? Those are interesting remedies, but we're just not interested in them anymore. We're not homeschooling. Those are just not things that we think would be beneficial. We seek other kinds of damages. And I think the courts have been clear, once again, including the Ninth Circuit, with regard to it doesn't make any difference what they're seeking. We really need to focus in on what is in the best interest of that student. And is it compensatory education? The courts have talked about compensatory education in the sense of we need to address that educational issue now, because, you know, he was in second grade. He's now a freshman. He's now 14 years of age. What could we have done during that period of time to redress some of these compensatory education, occupational therapy, physical therapy, psychological counseling? And that's the reason why exhaustion makes so much sense. And if, in fact, they felt that they hadn't remedied all those issues, then you can bring it up to court and say, wait a minute, we've tried this process. We've tried it like we did in Cunnington. You know, all of these issues. Thank you. You have the time. Would you like a minute to rebuttal? Just a minute. Thank you. Would you start where you ended? Why didn't you go back and get the school district to pony up on those issues? And how soon should you have had to do that before you come to the district? Certainly. DP had an occupational therapist, Cara Magillard, on the record 380 to 384. He had all these services in place. All of this was moving forward. The concern that the parents had at that time was to make sure that this additional trauma stopped. And when they got that door off, it was satisfied, and they moved him to a different school. All of it was resolved. He still had an educational team in place. He had an occupational therapist. He had doctors and psychologists. So it was all there, and he was being treated for that. So can you explain the relationship between Paragraph 511 and 7.1, your damages? What are your general and special damages, and how do they relate to being triggered by 511? Your Honor, as stated in the district court in front of Judge Layton, in front of the three panel here, the teens are only asking for pain and suffering. The complaint may have been pled more broadly at that time, but there was never an attempt. Past pain and suffering, no future pain and suffering? No future pain and suffering seen by the jury when they observed the young man in court? It would be for all pain and suffering, Your Honor. All pain and suffering? Correct. Because some of that pain and suffering had been alleviated by applying for the administrative procedure? I don't think so, Your Honor. Because he had an occupational therapist and a team in place. What about a psychologist? I mean, how are you going to separate when you go there, he's still in the system, and maybe there's other services he should be provided within the system, and you're presumably going to be putting those on a special damages form to the jury that would include psychiatric, medical, all that. Isn't that precisely what the school is saying? If it needs to be provided because it came out of that educational setting, then they may have the requirement to provide that. The same argument could have been made with and coming to you, Your Honor, is that any type of damage or injury, there's something that the district could argue they could have done. Any type of injury could say, well, we could have provided counseling. It wasn't the administrative procedure itself? No, there went to a mediation, just like in this case, Your Honor, where they met in accord and they moved on to a different school. The facts with regards to mitigation are exactly the same. You said before that this was not part of the IEP, and so what is on page 423 of the record and 425 of the record that talks about the attachment to the IEP that includes the aversive intervention? So why isn't that part of the IEP? The record will show that the pains came in September for the meeting, the teacher was unprepared and didn't have the document, said the document would be forwarded to them. They received that document, that September document, in January. At the same time, they received the aversion therapy plan. So all of the documents they received that counselors were relying upon were not in front of them in September but in January. Okay. Before you say that, I have a question I'll write in the minutes. I noticed that the caption on all the documents uses the child's name. I think in this case it was filed before the amendment to Federal Rule 5.2 that requires the use of initials for children. And our docket sheet still reflects the name of the child. Are you seeking substitution or correction of the docket sheet to use the child's initials? It will be done, Your Honor, if you don't mind me saying. And this is something that comes up in educational cases frequently where you'll see the parent's first and last name and then the initials of the child, and correction is not being terribly helpful because you can deduce. Yes, if the idea is to take the child. So are you going to seek substitution of initials for, or perhaps just the first name and initial for the mother or something of that sort? I will, Your Honor. You will file a motion to that effect? Correct. Okay. And, Your Honor, not to overstate my welcome, but just one quick point. In trial courts across the country every day, plaintiffs are asked or have to make decisions on whether to withdraw claims. And to develop a further factual record where experts are going to be brought in, I don't know how the Payne family would do that without an attorney or retaining experts to defend themselves in that due process hearing. It leads to a very difficult position. Thank you. Okay. Thank you. Appreciate your time, Mr. Counselor. Members, we are adjourned.
judges: Kozinski, O'scannlain, Silverman, Graber, McKeown, Fisher, Rawlinson, Bybee, Callahan, Bea, M. Smith, Cjj